1

```
 1                  UNITED STATES DISTRICT COURT

 2                  SOUTHERN DISTRICT OF FLORIDA

 3                  CASE NO. 09-20044-CR-HUCK

 4    UNITED STATES OF AMERICA

 5

 6         vs.

 7    RICARDO FIGUEREDO,

 8                   Defendant

 9

10                 SENTENCING HELD 4-14-09

11            BEFORE THE HONORABLE PAUL C. HUCK

12               UNITED STATES DISTRICT JUDGE

13    APPEARANCES:

14    FOR THE GOVERNMENT:      MICHAEL DAVIS,

15                             ASSISTANT UNITED STATES ATTORNEY

16

17    FOR THE DEFENDANT:       DAVID EDELSTEIN, ESQUIRE

18    REPORTED BY:             PATRICIA SANDERS, RPR

19                             Official Court Reporter

20

21

22

23

24

25
```

```
 1                    I N D E X

 2                         DIRECT     CROSS      REDIRECT

 3  KEN VEGA                  3         13

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1         THE COURT:  We're here in the United States versus

2    Figueredo.  May I have appearances, please.

3         MR. DAVIS:  Good morning.  For the United States, Michael

4    Davis.  With me is Special Agent Luke Methot of the United States

5    Secret Service.

6         MR. EDELSTEIN:  Good morning. David Edelstein on behalf of

7    Mr. Figueredo.

8         THE COURT:  Good morning.  We have a number of objections.

9    The first one is the Government's objection regarding paragraph 22.

10   Apparently it takes the position that the loss was more than

11   $20,000,000.

12        MR. DAVIS:  Yes, Your Honor.  We are prepared to prove that

13   through the testimony of a witness.  We're prepared to proceed.

14        THE COURT:  All right.

15        MR. DAVIS:  The Government would call Ken Vega.

16   Thereupon,

17                         KEN VEGA,

18   having been first duly sworn or affirmed, was examined and testified

19   as follows:

20   BY MR. DAVIS:

21   Q.   Mr. Vega, tell us how you are employed.

22   A.   I am a senior investigator with Bank of America corporate

23    security.

24   Q.   How long have you been with Bank of America?

25   A.   For approximately ten years.

1  Q.   Did you participate in investigating this case, that is the

2   fraud scheme involving Mr. Figueredo, for the bank?

3  A.   Yes.

4  Q.   When did you first get involved?

5  A.   April 23rd, 2008.

6  Q.   That was shortly after a victim named EB complained to the bank?

7  A.   Yes.

8  Q.   Please explain briefly what was the -- what were the general

9   things you did as part of investigating this case.

10  A.   As part of the investigation we looked at the initial complaint

11   that was filed by EB with the bank to see the transactions that he

12   was disputing.

13       At that time we looked further into the transactions to

14   determine the validity, interviewed the customer, and obtained an

15   affidavit of the claim.

16  Q.   Sometime thereafter did Mr. Figueredo admit that he had

17   defrauded EB and other customers?

18  A.   Yes.

19  Q.   Did you speak with a number of customers in investigating this

20   case?

21  A.   Yes.

22  Q.   Approximately how many?

23  A.   Approximately 20.

24  Q.   As part of your role along with other bank representatives, did

25   you attempt to determine the amount of money that was

1   misappropriated from the bank?

2   A.   Yes.

3   Q.   How was that done?

4   A.   By receiving the claim affidavits from the individual claimants

5    as well as reviewing the statements.

6   Q.   In the course of this investigation, you actually talked with

7    the defendant as well, correct?

8   A.   Yes.

9   Q.   What information in general did the defendant give you about the

10   monies that were misappropriated?  Was he able to describe different

11   victims and different amounts?

12   A.   Yes, sir.

13   Q.   Mr. Vega, do you recognize Government's Exhibit 1?

14   A.   Yes.

15   Q.   What is it?

16   A.   A spreadsheet containing the listed dollar figures we were able

17   to obtain from the defendant, as well as the victims.

18        MR. DAVIS:  The Government would offer Exhibit 1 for

19   purposes of this sentencing, Your Honor.

20        THE COURT:  It will be received.

21   Q.   Was this a spreadsheet prepared by you or someone else?

22   A.   It was prepared by someone else.

23   Q.   Did you participate in the investigation that lead to the

24   preparation of this spreadsheet?

25   A.   Yes, I did.

1   Q.   Are you familiar with the general figures in this spreadsheet

2    and how they were reached?

3   A.   Yes.

4   Q.   The first three columns are relatively self explanatory.

5   A.   Yes.

6   Q.   The last name of the victim identified by initial, correct?

7   A.   Yes.

8   Q.   The first name identified once again by initial?

9   A.   Yes.

10  Q.   The last four numbers of different accounts involved in the

11   case?

12  A.   Yes.

13  Q.   I would like to jump over to the third column from the right

14   where it says loss per Ricardo's admission.  Who is Ricardo?

15  A.   The defendant, Mr. Figueredo.

16  Q.   Where it says per Ricardo, is that a part of the information

17   that he provided you in the bank's investigation?

18  A.   Yes.

19  Q.   How were these figures provided to you?

20  A.   Verbally.

21  Q.   At one time or over a number of meetings?

22  A.   This was over a number of meetings with Mr. Figueredo.

23  Q.   How is it that he was able to recall these figures, if you

24   recall?

25  A.   He recalled them mentally.  He was able to pull them up from his

1   memory.

2   Q.   Did he make certain adjustments?

3   A.   I don't recall.

4   Q.   If you go to the bottom of the first and second page, is there a

5   total for the amount that Mr. Figueredo told you he misappropriated

6   from the different customers?

7   A.   Yes.

8   Q.   Could you read that for the record?

9   A.   $29,497,732.

10  Q.   I want to go to the column immediately to the left of loss per

11  Ricardo's admission where it says customer filed claims.  What does

12  that refer to?

13  A.   The dollar figures we obtained through the customer affidavits

14  and their claims.

15  Q.   When you say customer affidavits, what are you referring to?

16  A.   The documents the customer signed making their claim to the bank

17  reporting their losses.

18  Q.   Did all of the customers provide affidavits?

19  A.   No.

20  Q.   Do the customer filed claims also include what the customers

21  claimed per a demand letter or a lawsuit?

22  A.   Yes, the dollar figure is included in there.

23  Q.   So some would have been affidavits, some would have been a

24  different form of claim?

25  A.   Yes.

1  Q.  As part of this process of determining the customer claims, did

2  you actually meet with a number of customers?

3  A.  Yes.

4  Q.  Approximately how many?

5  A.  Approximately 20.

6  Q.  What did this process involve?

7  A.  The process involved reviewing the customers statements and

8  getting their affidavits signed to show exactly what they were

9  claiming to the bank as losses.

10  Q.  What about review of records?

11  A.  Reviewing their records on a line by line basis to determine

12  unauthorized and authorized transactions.

13  Q.  Was the process of determining the customer filed complaints

14  easier for some customers as opposed to others?

15  A.  Yes.

16  Q.  Explain why that was the case.

17  A.  Some of the customers had numerous transactions that were

18  unauthorized and some of them had less transactions.

19  Q.  I would like to go to the second customer from the top of page

20  one, the customer's initial is EB, E as in Ellen and B as in Brown.

21  Is this someone who would have been easier or more difficult to

22  determine the loss amount?

23  A.  It would have been easier.

24  Q.  Why is that?

25  A.  There were only two transactions conducted on that particular

1   account.

2   Q.   Those transactions were?

3   A.   Two separate withdrawals from two separate CDs.

4   Q.   That totaled how much?

5   A.   1.2 million dollars.

6   Q.   This person, EB, is this the person who complained to the bank

7   in April of 2008 that triggered the investigation in this case?

8   A.   Yes.

9   Q.   If we go to the line above EB, JA, is this someone who would

10   have been more difficult to determine a loss amount?

11   A.   Yes.

12   Q.   Why was that?

13   A.   There were numerous transactions that passed through the account

14   that we had to determine line by line what was unauthorized and what

15   was authorized.

16   Q.   How did you do that?

17   A.   We sat with the client and the records had them go line by line

18   and advise us whether it was unauthorized or not.

19   Q.   What is the customer's filed claim for JA?

20   A.   $5,285,400.66.

21   Q.   What is the column to the left, CD claims?  What does that refer

22   to?

23   A.   CD claims -- the claims filed for CDs that the customers owned.

24   Q.   What do the lines -- or the columns debits and credits, what do

25   they refer to?

1  A.   Those are the unauthorized transactions that went through the

2  customers' accounts that we obtained by going through the line by

3  line analysis.

4  Q.   With the customers?

5  A.   Yes.

6  Q.   If you were to take the debits, subtract the credits, and add

7  the CDs, what is the amount that you would have reached?

8  A.   $5,285,400.66.

9  Q.   How did that compare to the amount that Mr. Figueredo admitted

10  misappropriating?

11  A.   It was consistent with the dollar amount he provided.

12  Q.   Going to the next line, EB.  The 1.2 million dollars that EB

13  said was misappropriated, how did that compare with Mr. Figueredo's

14  admission?

15  A.   It was accurate.

16  Q.   Going to the fourth entry, for YB.  Did the bank follow the same

17  process with YB?

18  A.   Yes.

19  Q.   What is the amount that YB claims?

20  A.   $470,637.52.

21  Q.   How did that compare to Mr. Figueredo's admission?

22  A.   It was consistent.

23  Q.   Going to the sixth line, OD.  Did you follow the same process

24  there?

25  A.   Yes.

1  Q.   What was the amount that OD claimed?

2  A.   $1,862,489.17.

3  Q.   How much did Mr. Figueredo say he misappropriated from OD?

4  A.   Two million dollars.

5  Q.   There's a lot of blank areas under debits and credits for

6  certain customers.  Notwithstanding those areas that were blank, do

7  you recall going over transactions with those customers as well?

8  A.   We reviewed the statements.  However, in some cases the

9  customers reviewed the transactions themselves and provided

10  affidavits.

11  Q.   So in some cases the customers backed out the transactions on

12  their own?

13  A.   Correct.  They provided us with a net figure.

14  Q.   Let's go to the bottom line.  For all of the customers who have

15  either provided affidavits, submitted demand letters, or filed

16  lawsuits, what is the total amount they claim was misappropriated

17  from their accounts?

18  A.   The people I met with?

19  Q.   Let me try the question again.  Go to the bottom line of the

20  second page.  For the 20 or so customers who either filed

21  affidavits, presented demand letters, or initiated lawsuits, what is

22  the total amount they claimed was misappropriated from their

23  accounts?

24  A.   $29,649,419.47.

25  Q.   How did that compare to what Mr. Figueredo said he

1  misappropriated from those customers?

2  A.   It was consistent.

3  Q.   Did the amounts that these customers claimed include the

4  interest that was owed to them on their accounts?

5  A.   No.

6  Q.   That would have been a separate amount?

7  A.   Yes.

8  Q.   I know you are not a lawyer, but is the bank in some sort of

9  settlement discussion or litigation with a number of these

10  customers?

11  A.   Yes.

12  Q.   Does this amount represent the amount the bank believes they're

13  legally obligated to pay or just the amount it believes to the best

14  of its conclusion was misappropriated from these accounts?

15  A.   It is the amount believed to be misappropriated.

16  Q.   So there may be separate legal issues between the bank and its

17  customers?

18  A.   Yes.

19  Q.   What limitation did the bank have on records it was able to

20  review?  Was there some kind of time issue?

21  A.   Yes, the record retention went back seven years.

22  Q.   How long does the scheme go back?

23  A.   According to Mr. Figueredo's admission, it went back to at least

24  the mid 90's.

25  Q.   Has the bank tried to, to its best ability, back out all the

1  unauthorized transactions?

2  A.   Yes.

3  Q.   To the best of the bank's ability, this 29 million dollar figure

4   is the net amount stolen?

5  A.   Yes.

6        MR. DAVIS:  Thank you.  That's all I have.

7        THE COURT:  Cross examination.

8        MR. EDELSTEIN:  Thank you.

9  Q.   Good morning, Mr. Vega.

10 A.   Good morning.

11 Q.   Let's start off by talking about the records.  The bank only has

12  access for records of the past seven years?

13 A.   Correct.

14 Q.   Does that mean that in terms of any unauthorized debits or

15  credits there would be no record of them if that occurred more than

16  seven years ago?

17 A.   Correct.

18 Q.   Part of the reason the bank is in litigation with some of these

19  customers is because of this problem with the records, correct?

20 A.   Yes.

21 Q.   It's difficult to ascertain what the loss amount is?

22 A.   Yes.

23 Q.   So you have to depend in large part upon my client's memory and

24  the information he provided in his debriefing, correct?

25 A.   Yes.

1   Q.   You tried to match that up as best as you could with information

2   you had?

3   A.   Yes.

4   Q.   In that debriefing, when you talk about that he misappropriated

5   or said he misappropriated approximately $29,000,000 from customer

6   accounts, those were unauthorized debits, correct?

7   A.   Correct.

8   Q.   He also informed you during those debriefings, and I am not sure

9   if you had seen the factual basis that was stipulated to, that

10  approximately $11,000,000 was transferred from one client's account

11  to another to cover interest payments on CDs, non existent CDs,

12  correct?

13  A.   I have seen that was your client's admission.  That was not

14  factually based on our research.

15  Q.   Of all these claimants that are filing claims, I think some are

16  providing a net amount, isn't it true that some of those customers

17  are actually demanding -- part of their claim includes interest they

18  feel they are owed because they believe they had an actual CD?

19  A.   That's accurate.  However, the figures they are providing are

20  principal losses.

21  Q.   Going specifically to the second transaction on the first page

22  of Government's Exhibit 1 relating to EB.  You indicated that every

23  unauthorized debit or credit would be reflected in the appropriate

24  columns, correct?

25  A.   Correct.

1  Q.   This was not possible for all of the customers because some did

2  not make claims yet, correct?

3  A.   Yes.

4  Q.   Looking at EB specifically, the transaction that started this

5  whole investigation, the 1.2 million dollar wire transfer from EB's

6  account to BG's account, BG being the other victim, it showed the

7  customer filed a claim for 1.2 million, correct?

8  A.   Correct.

9  Q.   It shows that it's a CD claim, right?

10 A.   Correct.

11 Q.   The unauthorized debit column, presumably 1.2 million should be

12 reflected there, correct?

13 A.   It's reflected in the CD column because that's where the funds

14 were taken.  Debits and credits reflect credits and debits that were

15 done on traditional checking and saving accounts.

16 Q.   I didn't know that.  Thank you.  In terms of the records going

17 back seven years, if there were fake interest payments that were

18 paid to the clients more than seven years ago, the bank would have

19 no report of that, correct?

20 A.   Correct.

21         MR. EDELSTEIN:  I have no further questions, Your Honor.

22         THE COURT:  Redirect?

23         MR. DAVIS:  None, Your Honor.

24         THE COURT:  Anything else?

25         MR. DAVIS:  We would rely on Mr. Vega's testimony.  We only

```
 1   need to establish an estimate --
 2              THE COURT:  So the answer is no.
 3              MR. DAVIS:  I'm sorry.  No other evidence, Your Honor.
 4              THE COURT:  For the defendant?
 5              MR. EDELSTEIN:  Evidence, no.
 6              THE COURT:  Okay.
 7              MR. EDELSTEIN:  If I may, this may be considered evidence.
 8   The stipulated factual basis --
 9              THE COURT:  I have read that.  You are talking about the
10   proffer?
11              MR. EDELSTEIN:  Correct.
12              THE COURT:  I have read that.  I have a copy in front of
13   me.
14              MR. EDELSTEIN:  Yes, Your Honor.
15              THE COURT:  Any argument?
16              MR. DAVIS:  We only need to establish a reasonable
17   estimate.  We did so through Mr. Vega.  The fact that the defendant
18   stipulated to $11,000,000 going back and forth between the accounts
19   does not preclude the bank from providing its own estimate.
20              We believe it's the accurate estimate, Your Honor.  We
21   would rest on the bank's testimony.
22              THE COURT:  Mr. Edelstein.
23              MR. EDELSTEIN:  The factual basis that was -- the facts
24   that were cited in the factual basis are contained in the
25   information as well, almost all of them, regarding the loss amount,
```

1  the $11,000,000 in interest payments.

2          Our whole reason for contesting this is that we feel this

3  is not a true reflection of a net loss.  That's the issue as far as

4  we're concerned.  The factual basis was not written by myself or my

5  client.

6          It was written by the Government after a few debriefings

7  with my client, one of which was before Mr. Davis was even assigned

8  the case.

9          It was our understanding that the information my client

10  provided, as well as information provided by the bank in reconciling

11  the information, produced this factual basis which we stipulated to.

12          Now we're hearing a different set of facts here in court at

13  sentencing.  I would rely on the factual basis.  I think it's an

14  accurate reflection of the parties' understanding of the net loss

15  amount.  The probation officer included the same in concluding it

16  was under 20,000,000.

17          THE COURT:  Did you say 120,000,000?

18          MR. EDELSTEIN:  I hope I didn't.

19          THE COURT:  I think you did, but I don't think you meant to

20  say.

21          MR. EDELSTEIN:  Under 20,000,000 is what I meant to say.

22          THE COURT:  The Government's factual basis in support of

23  entry of a guilty plea, which is docket number 15, does refer to the

24  eleven million some odd dollars, but also refers to paragraph five.

25

1      That says, over the course of the scheme, the defendant

2  embezzled approximately $29,591,540 from the accounts of different

3  victim customers, close quote.

4      MR. EDELSTEIN:  My reading of that is that $29,000,000 was

5  misappropriated from customers' account, i.e. embezzled, but that

6  does not address the $11,000,000 that should be applied against the

7  loss.

8      THE COURT:  In other words, you are saying it was

9  $29,000,000, but $11,000,000 should be deducted?

10      MR. EDELSTEIN:  It was almost like a Ponzi scheme.  He was

11  taking from certain accounts to cover reported interest payments on

12  accounts --

13      THE COURT:  As I understand it, like most Ponzi schemes,

14  you take from the subsequent investor, or in this case the customer,

15  to cover payments of interest or profits from the earlier investors

16  or account holders.  Those kind of off set.

17      So you are still left with $29,000,000 because he is taking

18  not only the principal, but the interest.  He is taking the interest

19  from B to give it to A.  It does not seem it changes the bottom

20  line.  It's still the $29,000,000.

21      MR. EDELSTEIN:  Maybe I should not have used the term Ponzi

22  scheme because it is different in there is an off set and the loss

23  amount is not going to be passed on down the chain.  It was not a

24  Ponzi scheme.

25      THE COURT:  Partially it was.  At least on one occasion he

1  took money from one customer to pay another customer.  I am assuming

2  he did that. So maybe it was not a pure Ponzi Scheme.  If the

3  $29,000,000 claim does not include interest, then I think the

4  $11,000,000 is kind of a wash.

5       MR. EDELSTEIN:  Our contention is that it does include the

6  purported interest payments to the clients' accounts.  We believe

7  the true loss amount is not reflected by the $29,000,000.  That's

8  not been netted out.

9       MR. DAVIS:  If I may clarify, the $29,000,000 figure and

10  the $11,000,000 figure in the Government's proffer came from two

11  different sources.

12       The $29,000,000 figure came from the bank.  That was the

13  bank's understanding at the time of its best estimate of the total

14  amount of unauthorized transactions.  The $11,000,000 figure came

15  from the defendant's admissions to the bank.

16       That is, at the time that this was all assembled, we had a

17  figure representing the net -- the total unauthorized transactions

18  by the bank and then we had independent admissions --

19       THE COURT:  Let me stop you.  We keep using this

20  $11,000,000 figure.  I don't see in the proffer an $11,000,000

21  figure.  I see in excess of $11,000,000.

22       MR. DAVIS:  I'm sorry, in excess of 11,000,000.

23       THE COURT:  That could be a billion dollars.  I don't know

24  that means anything other than it's at least 11,000,000.

25       MR. DAVIS:  The bottom line is that the plea agreement left

1    open what the actual net loss amount was.  That was something we

2    were going to try to resolve --

3              THE COURT:  That was my understanding.

4              MR. DAVIS:  The bottom line is, I don't think we're bound

5    by -- that the factual proffer puts a ceiling on the net loss

6    amount.  I think we can rely on the testimony of the witness.

7              THE COURT:  From my point of view, even if you are bound by

8    it, it's in excess of $11,000,000.  That's a floor level.  It would

9    preclude the defendant from going below that floor unless he could

10   show there was a huge mistake and set that aside.

11             I am convinced the loss is in excess of $29,000,000.  The

12   admission by the defendant is pretty strong evidence.  Then you have

13   the customers' filed claims are within $200,000.

14             When you go down and track them from the beginning to the

15   end, the various customers names or accounts, they're pretty close

16   on each instance.

17             Sometimes the defendant's admission is a little higher,

18   sometimes a little bit lower.  I would expect that Mr. Figueredo

19   would probably, unless he spent a lot of time, would probably be a

20   little off.  Maybe even the customers are a little off.

21             They are in essence pretty much the same.  Even if you give

22   a little bit of an error in calculation it certainly would not be

23   anywhere close to $9,000,000.  The evidence, I think, is very clear

24   that it's in excess of $20,000,000.

25

1    I am going to sustain the Government's objection.  The

2  defendant has a number of objections.  One was he was not originally

3  given credit for acceptance of responsibility.  That has been

4  resolved.  He has received three levels, correct?

5         MR. DAVIS:  Yes, Your Honor.

6         THE COURT:  The next issue is that the PSI assigned to this

7  operation a sophisticated means enhancement pursuant to 2B1.1(b)(c).

8  The Government supports the defendant's objection, correct?

9         MR. DAVIS:  Yes, Your Honor.

10         THE COURT:  It seems to me that you could make a pretty

11  good argument that it is sophisticated and that probation may be

12  correct.  I think it's kind of a gray area.

13         I am not sure how this is any less sophisticated than using

14  shell corporations and things like that.  He moved money between and

15  among his customers.  He had a fairly elaborate fraudulent spiel as

16  to why he had to have complete control of the accounts.

17         Therefore leading the bank customers to believe that he was

18  the one who should be entrusted with not only the funds, but

19  complete access of the information relating to the funds.  I think a

20  good argument could be made that it was a sophisticated operation.

21  I will hold that aside.

22         The next is abuse of trust.  The Government disagrees in

23  that instance.  It seems to me it's going to have to be at least one

24  or the other.  It may well be the Government might be correct.

25  While it's a somewhat sophisticated operation, even though it was

```
 1    only one person, it may be better allocated under abuse of trust.

 2    So let's talk about that.

 3           I have read the memos from both sides.  I am inclined to

 4    agree with the Government's position that it's not, particularly in

 5    this kind of an instance, it's not specifically limited to the

 6    bank's loss.

 7           I think everyone would agree that vis-a-vis his customers

 8    he had a position of trust.  I think even the defendant would have

 9    to concede that point.

10           MR. EDELSTEIN:  Regarding that issue, we actually don't

11    accept that analysis that he held a position of trust, as the term

12    of art --

13           THE COURT:  I am not talking about the term of art.  I am

14    saying vis-a-vis his customers, he was in a position of what would

15    typically be a position of trust.

16           You are saying we don't look to his relationship with his

17    customers, we look to his relationship to the bank.  I understood

18    that was your argument.

19           MR. EDELSTEIN:  Right.  My argument is that it is not

20    actually a position of trust under the analysis of 3B1.3.

21           THE COURT:  I understand.  Your argument, as I read it, is

22    that he does not get a breach of trust because he is not in a

23    position of trust vis-a-vis his employer, the bank.

24           MR. EDELSTEIN:  I am saying --

25           THE COURT:  And that you only look to the bank.
```

1          MR. EDELSTEIN:  Correct.

2          THE COURT:  I am saying you would agree, I would assume,

3    that his position vis-a-vis his customers was a position of trust.

4          MR. EDELSTEIN:  Under 3B?

5          THE COURT:  Just as a position of trust.

6          MR. EDELSTEIN:  In the vernacular, yes.  He stole money

7    obviously.

8          THE COURT:  You can steal money from a complete stranger,

9    that's not a breach of trust.  He had a special relationship.  You

10   are saying the Court shouldn't look to his relationship with his

11   customer clients, only to his relationship with the bank.

12         MR. EDELSTEIN:  Yes.  I think the way it's been

13   interpreted, I don't think a position of trust is appropriate

14   vis-a-vis the customer, only the analysis between the employer and

15   my client.

16         THE COURT:  You cite a number of cases, including the Sixth

17   Circuit case, the Raglin case.  It appears to me though, in our

18   case, it may not fall on all fours with the various cases the

19   parties cite.

20         It seems to me that the Court is entitled to look at his

21   relationship with his customers and clearly that would be a breach

22   of his obligation to his clients/customers.  On that basis, it would

23   be applicable.

24         Even if you look only to the bank, I agree with the

25   Government's analysis -- and also to a certain extent I agree with

1  yours, it falls between the bank president and the teller. But as

2  the assistant branch manager, particularly with all the -- what he

3  was given in terms of decision making authority, that he was not

4  under such supervision that he would be I think in the category more

5  akin to a bank teller, but would be more akin to somebody in the mid

6  range to high executive with sufficient discretion.

7         I think he qualifies both because he breached his

8  responsibility to his customers.  And even if it was just to the

9  bank, I think he falls closer to the executive officer of the bank

10  as the assistant branch manager.

11         If that were not the case I would certainly come down that

12  he was using sophisticated means.  It just stands to reason if he is

13  not being monitored he has certainly set up, in practice, a

14  sophisticated way to avoid being monitored.

15         I think the better approach, I think the proper one, is to

16  find that he is in fact guilty of breaching his fiduciary duty and

17  trust, both to the bank and his clients and customers.  That's my

18  view on it.

19         I will overrule it and sustain the objection regarding to

20  sophisticated means, which I think you can make a good argument on.

21         It did entail sophisticated means, particularly when you

22  look over the lifetime of this fraudulent activity.  It went on for

23  many years.  Moving monies back and forth and covering with various

24  stories, covering one account with another account.  However, I am

25  not going to hold him responsible for both sophisticated means and

1    breach of trust.  I think that takes care of all of the objections;

2    am I right?

3              MR. EDELSTEIN:  Yes, Your Honor.

4              THE COURT:  I think that takes us back to where we started.

5    There is more money involved, $29,000,000 as opposed to less than

6    $20,000,000.  It adds two, but we subtract two because I am

7    eliminating the plus two for sophisticated means.

8              MR. DAVIS:  We're back at level 32.

9              THE COURT:  We're back at 32 with an advisory guideline

10   range of 121 to 151 months, right?

11             MR. DAVIS:  That's where we are, 121 to 151.

12             THE COURT:  Mr. Edelstein, other than the fact that I ruled

13   against you on a couple of these matters, you agree that's the right

14   computation?

15             MR. EDELSTEIN:  I agree based upon your rulings that is the

16   correct calculation.

17             THE COURT:  I see that in the proffer, maybe the PSI, that

18   a lot of this money was used for investments which turned out to be

19   bad investments.  I guess the question that cries out to be answered

20   is, where is all the money?

21             MR. DAVIS:  We have done our best to determine where it is.

22   We think the money is all gone.  Mr. Edelstein briefly noted this,

23   Your Honor --

24             THE COURT:  He gave a polygraph and it came up he was not

25   deceptive.

1          MR. DAVIS:  That's correct.

2          THE COURT:  He had these funds no longer.  It just boggles

3     the mind how these monies could go like that.  Was he asked about

4     transferring funds to related entities or relations?

5          MR. DAVIS:  No, Your Honor.

6          THE COURT:  The reason I asked that, I see in 2008 he

7     transferred one of the real estate properties to his wife and

8     daughter presumably for no other consideration other than love and

9     affection.

10          MR. DAVIS:  The general question was something along the

11     lines if he had covered up -- if he failed to reveal any assets he

12     had.

13          MR. EDELSTEIN:  He had provided a list of all the property

14     he had given back or was going to give back.

15          The questions were designed to determine whether or not he

16     had any other assets under his control in any form, whether real

17     estate or anything, that he had not already disclosed.  That was the

18     thrust of the whole polygraph examination.

19          THE COURT:  What about the property that he transferred to

20     his wife and daughter?

21          MR. EDELSTEIN:  That property -- first of all, that was

22     known by the Government and Secret Service.

23          THE COURT:  Is he transferring it back or is the family

24     transferring the property back to the bank in lieu of restitution

25     payments?

1        MR. EDELSTEIN:  That because it is the family domicile, I

2  believe it's the homesteaded property, it predated the allegations

3  of embezzlement, I believe that's the only thing my client has not

4  agreed to in the civil lawsuit because of that.

5        THE COURT:  Okay.  The other property, the Meridian Avenue

6  and the Hialeah property.

7        MR. EDELSTEIN:  In the process of being liquidated.

8        THE COURT:  I am assuming that Mr. Figueredo did not report

9  his fraudulent income to the IRS?

10       MR. EDELSTEIN:  I believe that's correct.

11       THE COURT:  So, he has also violated his obligations as a

12  taxpayer as well.

13       MR. EDELSTEIN:  That is the law.  I cannot say that is

14  otherwise.

15       THE COURT:  It's pretty obvious.  So we have $29,000,000

16  gone essentially.  The reason I ask that is because I got a lot of

17  letters from mainly family members in support of Mr. Figueredo.

18       I want those people, some of who are sitting in the

19  audience, who wrote letters of support Mr. Figueredo -- I am not

20  sure they knew all the circumstances.

21       They may not have been here for the proffer.  Here's a case

22  where Mr. Figueredo stole $29,000,000 from people that trusted him.

23  I am not sure I can agree with the letters that say he is an honest

24  man.  Several people say a person of good moral character and

25  basically a good person.

1       Say he is an honest, law abiding person who can benefit our

2    society and things of that nature.  It's an unfortunate situation.

3    It's in some respects a small Madoff case.

4       I don't know the circumstances of these people.  They may

5    be very wealthy people and this is just a blip on their financial

6    radar screen.  On the other hand, it may be the life savings of

7    these people.

8       They worked hard with their businesses, and their financial

9    lives are essentially ruined.  It's hard to explain.  Is there

10   anything the Government would like to recommend or add?

11      MR. DAVIS:  In the plea agreement we recommended the low

12   end of the guidelines.  The reason why we did that is shortly after

13   Mr. Figueredo was caught, he came forward, he admitted what he did.

14      He has met with agents extensively.  He has met with the

15   bank extensively.  As far as where he sits within the guidelines, we

16   believe he deserves some credit for the very early acceptance of

17   responsibility and for that reason we agree to recommend the low

18   end.

19      THE COURT:  Mr. Edelstein.

20      MR. EDELSTEIN:  Obviously I agree with everything the

21   Government just stated.  The specific steps he took I outlined in my

22   objections to the PSI.

23      One thing I neglected to put in my objections was the fact

24   that not only did he surrender his passport early on and surrender

25   to the Secret Service for his first appearance, he agreed to

1  surrender himself and go into custody at the time of the change of

2  plea as well. He has done everything he can to try to make amends

3  for what he did.

4        There's no taking away from the facts of the case and the

5  large amount of money that was taken and the violation of trust and

6  everything the Court mentioned.

7        As much as he has been able to, he has tried to make as

8  much amends as he is able to.  Whether that means providing

9  information to the bank to help sort out their claims with their

10 customers, giving up property, he has done it.

11       He is at the mercy of the Court.  He is perfectly at peace

12 and accepting the Court's judgment as to what his sentence should

13 be.

14       THE COURT:  What do you recommend?

15       MR. EDELSTEIN:  I would recommend that it be at the lower

16 end of the range.

17       THE COURT:  That's 121 months?

18       MR. EDELSTEIN:  Yes.

19       THE COURT:  I am perplexed at how that amount of money can

20 just disappear.  I think the low end is appropriate.  I have an

21 alternative I am prepared to throw out.

22       And that is, rather than 121 months imprisonment, I am

23 thinking of 100 months imprisonment plus he will be on supervised

24 release for five years.  Rather than all that time in prison, some

25 of the time or a substantial portion of the time will be in home

```
 1   confinement. I am thinking in terms of 100 months in prison and 24

 2   months or more in home confinement, during which period of time he

 3   will be performing almost full-time community service.

 4          Let me hear from the Government.

 5          MR. DAVIS:  We certainly accept the Court's judgment and

 6   wisdom.  We would prefer the 121 month term of imprisonment. But if

 7   the Court wishes to impose that period of community service as part

 8   of the supervised release that follows that the Government would

 9   agree.  We would like to see the defendant serve the ten year term

10   of imprisonment, Your Honor.

11          THE COURT:  Mr. Edelstein, you can confer with your client.

12   I am prepared to take your recommendation of 121 months in prison or

13   116 months in prison followed by -- that's not a whole lot, it's not

14   a big difference, followed by 12 months of supervised release on

15   home confinement, working 3,000 community service hours that year.

16          MR. EDELSTEIN:  Judge, if you are asking our position on

17   that --

18          THE COURT:  Yes, sir.

19          MR. EDELSTEIN:  We would prefer the 116 months.

20          THE COURT:  Let me tell you my reasoning.  I see these

21   cases.  Here is Mr. Figueredo who is -- it's a very serious crime.

22   It's affected a lot of peoples' lives, mainly the customers and

23   clients of the bank, plus his family.

24          I am leaning towards the latter.  He will be working

25   basically full-time that year.  While it's an insignificant amount
```

1   in comparison to the losses he caused, at least he will be

2   contributing something.  Does Mr. Figueredo wish to say anything?

3        DEFENDANT:  Just for the actions I did, I want to apologize

4   to the United States and especially my family and the victims of

5   course.  I am very, very sorry.

6        THE COURT:  All right.  I have considered the statements of

7   the parties.  I have ruled on the objections.  With regard to the

8   presentence investigation report, I am adopting the findings of

9   facts and conclusions set forth in that report, other than those

10  that are reflected by my granting of the objections.

11        I have considered the advisory guidelines as well as the

12  statutory factors set forth in Section 3553, 18 United States Code.

13  I think a sentence slightly below the advisory guideline range is

14  sufficient to meet those goals together with the home confinement

15  portion of the sentence.

16        Therefore, I am going to deviate somewhat from the

17  guidelines.  It is also the finding of the Court that given the huge

18  restitution amount, Mr. Figueredo is unable to pay a fine therefore

19  no fine will be imposed.

20        Therefore, it is the judgment of the Court that the

21  defendant Ricardo Figueredo is to be committed to the Bureau of

22  Prisons to be imprisoned for a term of 116 months.

23        Pursuant to Title 18 of the United States Code Section 3664

24  (d)(5), the victims' losses are not specifically ascertainable at

25  this time therefore I will set a date for final determination of the

1    victims' loss and that will be accomplished within 90 days.

2    Upon Mr. Figueredo's release from prison, he shall be

3    placed on supervised release for a term of five years for Count 1.

4    Within 72 hours of his release he shall report in person to the

5    Probation Office in the district into which he is released.

6    While on supervised release, he shall not commit any

7    crimes, is prohibited from possessing a firearm or other dangerous

8    device or weapon, and shall not possess any controlled substance.

9    He also shall comply with the standard conditions of

10   supervised release adopted by this Court with the following special

11   conditions:

12   He shall comply with the substance abuse treatment program,

13   the financial disclosure requirement, and the employment requirement

14   as noted in part G of the presentence investigation report.

15   In addition, for the first 12 months of his supervised

16   release he shall be confined to his home pursuant to the rules and

17   regulations of home confinement.

18   He shall wear a monitoring system and pay the cost of the

19   monitoring system.  He shall have a phone at his place of residence

20   without any apparatus to interfere with the ability of the Probation

21   Office to monitor his home confinement.

22   During the first 12 months of supervised release, he shall

23   complete 3,000 hours community service and that is to be performed

24   over the period of the 12 months, not to be put off to the end of

25   the first year.

1    For the remaining four years of supervised release, he

2    shall perform community service as follows:  If he is full time

3    employed, that is 40 hours a week, he shall perform 750 hours of

4    community service.

5    If he is not fully employed, he shall perform 2,000 hours

6    of community service.  If he is part time employed, it will be some

7    pro rata relationship between his hours of work and his community

8    service.

9    Those hours are to be performed on an annualized basis,

10   which means he cannot carry his obligation from one year to the

11   next.  Finally, the defendant shall immediately pay the United

12   States a special assessment of $100.

13   Therefore, the total sentence in this case is 116 months

14   imprisonment, five years supervised release including 12 months home

15   detention, community service as I have indicated, and a special

16   assessment of $100.

17   Mr. Figueredo, now that sentence has been imposed, do you

18   or your counsel object to the findings of facts or the manner in

19   which sentence was pronounced this morning?

20   MR. EDELSTEIN:  No, just the objections previously stated.

21   THE COURT:  Mr. Figueredo, to the extent that you have not

22   waived your right to appeal, you would have the right to appeal the

23   sentence I just imposed.

24   You must file the notice of appeal within 10 days after the

25   entry of judgment against you.  If you are unable to pay the cost of

1  the appeal the Government will pay for your appeal.  Do you

2  understand you have those rights?

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  Is there anything further?

5          MR. DAVIS:  With respect to the restitution, we will

6  provide the figures to the Probation Officer and Mr. Edelstein.  We

7  would like to make certain that the victims' names and addresses do

8  not appear in any public document.

9          THE COURT:  I am sure the defendant does not have a problem

10  with that.

11          MR. EDELSTEIN:  No, Your Honor.

12          MR. DAVIS:  I will compile the figures -- restitution

13  figures based on the bank's estimate.

14          THE COURT:  It will be good, if you can, to get further

15  certification or something from those individuals.

16          MR. DAVIS:  We will figure out where are.

17          THE COURT:  If there are lawsuits going on -- it's kind of

18  a moot question to a great extent, I suspect, whether there will be

19  payment.  Anything from the defendant?

20          MR. EDELSTEIN:  No, Your Honor -- well, actually I do have

21  two things.  One is a recommendation to the Bureau of Prisons for

22  the 500 hour drug and alcohol treatment program.

23          THE COURT:  I will recommend that.

24          MR. EDELSTEIN:  The other is, if possible, he be kept in

25  the State of Florida, preferably the Southern District.

1           THE COURT:  I will recommend that he be placed in a

2    facility as close as is available and appropriate in South Florida.

3    Anything else?

4           MR. DAVIS:  No, Your Honor.

5           MR. EDELSTEIN:  Nothing, Your Honor.

6           THE COURT:  Thank you all.

7                       -  -  -

8                 C E R T I F I C A T E

9        I hereby certify that the foregoing is an accurate

10   transcription of proceedings in the above-entitled matter.

11

12                              /S/PATRICIA SANDERS

13   _____            _____

14   DATE FILED            PATRICIA SANDERS, RPR

15

16

17

18

19

20

21

22

23

24

25