**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 09-20044-CR-HUCK**

**UNITED STATES OF AMERICA**

**vs.**

**RICARDO FIGUEREDO,**

**Defendant**

**PLEA TAKEN 2-3-09**

**BEFORE THE HONORABLE PAUL C. Huck**

**UNITED STATES DISTRICT COURT**

**APPEARANCES:**

**FOR THE GOVERNMENT:** **MICHAEL DAVIS,**
**ASSISTANT UNITED STATES ATTORNEY**

**FOR THE DEFENDANT:** **DAVID EDELSTEIN,**
**ASSISTANT FEDERAL PUBLIC DEFENDER**

**REPORTED BY:** **PATRICIA SANDERS, RPR**
**Official Court Reporter**

THE COURT: We're here in United States versus Figuerado. May I have appearances, please.

MR. DAVIS: Michael Davis for the United States.

MR. EDELSTEIN: David Edelstein on behalf of Ricardo Figueredo.

THE COURT: It's my understanding we're here for a change of plea and we have a plea agreement.

MR. EDELSTEIN: That's correct.

THE COURT: Please have Mr. Figueredo come to the podium and we'll swear him in.

DEFENDANT SWORN

Q. Please tell us your full name.

A. Ricardo Figueredo.

Q. Do you understand you are now under oath, you will be required to answer my questions truthfully, and if you answer them falsely that answer could later be used against you in a criminal prosecution for perjury or making a false statement?

A. Yes.

Q. Tell us how old you are and where you were born?

A. 51. I was born in Guatemala.

Q. Of what country are you a citizen?

A. United States.

Q. How far did you go in school?

A. I went to college.

Q. Did you graduate?

**A. No, I did not.**

**Q. Have you ever been treated for mental illness, drug addiction or alcoholism of any kind?**

**A. No, sir.**

**Q. Are you currently under the influence of any medication, drugs, narcotics or any similar substance?**

**A. No.**

**Q. Have you taken or consumed any of those substances in the past 24 hours?**

**A. No.**

**Q. Are you being seen by a doctor for any medical condition?**

**A. Yes, I am. Diabetes and high blood pressure.**

**Q. Is it causing you any problem this morning?**

**A. No.**

**Q. If so would you let your counsel and the Court know promptly?**

**A. Yes.**

**THE COURT: Mr. Edelstein, do you have an opinion whether your client is fully competent and capable of entering a voluntary guilty plea this morning?**

**MR. EDELSTEIN: Yes, I do have an opinion. My opinion is he is fully competent to enter a voluntary guilty plea.**

**Q. Let's talk about the charges. First of all, have you received a copy of the information that is pending against you, that is the formal written charges which the Government has**

**brought against you in this case?**

**A. Yes, I have.**

**Q. Have you discussed those charges and the case in general and any potential defenses you might have in defending against those charges with your counsel Mr. Edelstein?**

**A. Yes.**

**Q. Are you fully satisfied with the legal representation and advice that he has given to you in this case?**

**A. Yes.**

**Q. Is there anything about Mr. Edelstein's representation of you in this case that you are not completely satisfied with?**

**A. No.**

**Q. Now, I see what appears to a signed plea agreement. Is your willingness to plead guilty this morning as a result of discussions Mr. Edelstein has had with the Government which discussions have resulted in this plea agreement?**

**A. Yes.**

**Q. The information charges you with violating 18 United States Code Section 1344 by knowingly and willfully engaging in a scheme to defraud a Federally insured financial institution by means of materially false and fraudulent pretenses, statements and misrepresentations. Do you understand the nature of that charge?**

**A. Yes.**

**Q. It's my understanding you have agreed to plead guilty to**

that count. Before you do so I want you to understand what the Government would have to prove beyond a reasonable doubt in order for a jury to convict you of the crime charged in the information.

The Government would have to prove the following beyond a reasonable doubt: From on or about September 30th, 1998 continuing to on or about May second, 2008 you knowingly and with the intent to defraud did execute and attempt to execute a scheme to defraud and obtain money from a Federally insured financial institution by means of materially false pretenses, misrepresentations and promises.

Do you understand the Government would have to prove those facts beyond a reasonable doubt for you to be found guilty?

A. Yes.

Q. With regard to potential sentence and penalties that go along with that charge. It carries with it a maximum sentence of up to thirty years imprisonment, a term of supervised release of up to but not more than five years, a maximum fine of up to $1,000,000 or twice the gross loss resulting from the criminal activity, restitution to the victim of the crime and a mandatory special assessment of $100.

Do you understand I can impose a sentence within those terms if you plead guilty to the counts set forth in the information?

**A. Yes.**

**Q. Have you discussed the Federal Sentencing Guidelines with Mr. Edelstein?**

**A. Yes, I have.**

**Q. Do you understand these guidelines will assign to you a numeric score based upon the nature of the offense to which you are pleading guilty and the Court will take those guidelines into consideration together with other appropriate factors in determining what a fair and reasonable sentence should be for you in this case?**

**A. Yes.**

**Q. Do you understand that these guidelines are merely advisory, they are not binding on the Court, therefore I do not have to follow them, and that may result in you receiving a sentence that might be higher or lower than that which is recommended by the guidelines?**

**A. Yes.**

**Q. Do you understand that once the guilty plea is accept you will not be able to change the guilty plea solely as a result of the sentence given you in this case?**

**A. Yes.**

**Q. Now, Mr. Edelstein, and maybe someone else, may have given you an opinion or estimate as to what that person believes your sentence may be in this case. I want you to understand that is merely that person's opinion or estimate, which is not binding**

upon the Court, and it is the Court alone which will determine what the appropriate sentence is after reviewing the presentence report and hearing from all the parties. Do you understand that as well?

A. Yes.

Q. I note in your plea agreement, in paragraphs 17 and 18, that you acknowledge that you have the right to appeal any sentence but you have agreed to give up or waive those rights to appeal. Do you understand that?

A. Yes.

Q. Before you signed the plea agreement did you thoroughly discuss with Mr. Edelstein what it means to have the right to appeal and what it means to give up the right to appeal pursuant to your plea agreement?

A. Yes.

Q. Do you have any questions of Mr. Edelstein or the Court about what it means to give up your right to appeal?

A. No.

Q. It's my finding the defendant Mr. Figueredo has knowingly and voluntarily given up the right to appeal pursuant to his plea agreement. Speaking of the plea agreement, do you have a copy of the plea agreement in front of you?

A. Yes.

Q. Turn to the last page and tell me if that's your signature.

A. Yes, it is.

Q. Before you signed that plea agreement did you carefully read it over and discuss it with Mr. Edelstein?
A. Yes, I did.
Q. Did he answer to your satisfaction any and all questions that you might have had about the plea agreement, what each term and condition means and how it can affect you?
A. Yes.
Q. When you signed the plea agreement, as you stand here now, do you believe you have a full, fair and complete understanding of exactly what the plea agreement means, what each term and condition means and how it can affect you?
A. Yes.
Q. In that plea agreement there are recommendations being made to the Court. I want you to understand those are merely recommendations, which I do not have to accept, in other words, I can reject them. That may result you in getting a higher sentence than you are anticipating. Do you understand that as well?
A. Yes.
Q. The signed plea agreement you have in front of you is that the full, complete agreement you have with the Government in this case?
A. Yes.
Q. Other than what is contained in the plea agreement has the Government or anyone else given you any promise, any assurance

00:07 or anything else in an effort to get you to plead guilty?

00:07 A. No.

00:08 Q. Has anyone attempted to force, coerce or threaten you in any way to get you to plead guilty?

00:08 A. No.

00:08 Q. Are you pleading guilty voluntarily and of your own freewill because you are in fact guilty of the crime charged in the information?

00:08 A. Yes.

00:08 Q. The offense to which you are pleading guilty is a felony offense, and if the plea is accepted you will be adjudged guilty. As a result you will lose some very important rights. You will lose your right to vote in an election, your right to hold public office, your right to sit as a juror in a jury trial, the right to possess a firearm or other dangerous device or weapon.

It may also effect your immigration status and your ability to remain in this country or to return to this country. Do you understand by pleading guilty you will be giving up those very important rights?

A. Yes.

Q. The next question is very important, I want you to think carefully about it. Do you understand that you have the complete right to plead not guilty to the charges and to persist in that plea of not guilty?

A. Yes.

Q. Do you also understand at that trial if you had pled not guilty to the charges you would have the right to a trial by jury in this very courtroom and at that trial you would have certain rights?

First, you would be presumed innocent of all the charges. It would be the Government's burden to prove your guilt beyond a reasonable doubt. You would also have the right to be represented by counsel such as Mr. Edelstein here.

You would have the right to see and to hear and to cross examine all of the Government witnesses who would be called to testify against you.

Also, if there were witnesses that could help you in your defense you could compel them to come to trial by issuance of subpoena or other compulsory process.

Also at that trial you would not have to testify but could remain silent unless you decided it was in your best interest to testify. If you decided not to testify that silence could not be used against you in any way and you would still be presumed innocent.

Do you understand by pleading guilty you will be giving up the right to a trial by jury and all those rights that go with that trial by jury I have just discussed?

A. Yes.

THE COURT: I am going to ask the Government to tell us what it could have proven had this case gone to trial. Please listen carefully to what the Government says you did in this case.

00:10 MR. DAVIS: If this case were to go to trial the United States would establish the following: At all times relevant to this case the deposits of Bank of America and its predecessor institutions, Nations Bank and Barnett Bank were insured by the Federal Deposition Insurance Corporation.

00:10 From on or about September 30th of 1998 until the termination of his employment on or about May second, 2008 the defendant was employed by Bank of America as an assistant branch manager for the Bank of America branch that was located at 410 Lincoln Road on Miami Beach, Florida. Prior to becoming employed at Bank of America the defendant was employed by Bank of America's predecessor institutions Barnett Bank and Nations Bank.

00:11 The defendant was first employed by Barnett starting in the early to mid 1980s and continued to remain so employed when Barnett merged into Nations Bank on or about January ninth, 1998. The defendant remained employed with Nations Bank from the time of the merger with Barnett until Nations Bank became Bank of America on or about September 30th, 1998.

00:11 As assistant branch manager with Bank of America the defendant's job responsibilities included servicing customers

00:11 who resided outside of the United States but who maintained accounts with Bank of America in South Florida.

Although not his official title while at Bank of America the defendant held himself out as the bank's international assistant manager, and went as as far as to print up business cards identifying that job as his title. While employed at Barnett Bank and Nations Bank the defendant's responsibilities also included servicing customers who resided outside of the United States but who maintained accounts in South Florida.

By approximately the mid nineteen nineties the defendant started embezzling funds from the accounts of bank customers. From the mid nineties until the termination of his employment on or about May 2nd, 2008, the defendant embezzled funds from accounts in excess of 20 victim customers.

During the course of the scheme the defendant embezzled approximately $29,591,540 from the accounts of the different victim customers.

The defendant targeted bank customers who resided outside of the United States and who owned accounts with large deposits. Generally in excess of $100,000. A number of the victim customers had deposits in excess of $1 million.

The victim customers maintained accounts in the United States because of the perceived superior security of the U.S. banking system. The defendant enlisted the trust of the victim customers by purporting to provide attentive service and in

some circumstances by purporting to secure interest rates that were substantially higher than the generally available rates of return. The defendant caused the victim customers to take steps that limited their ability to monitor account activity and that enabled the defendant to misappropriate funds from the customers' accounts without their knowledge or consent.

To minimize the possibility that either the customers or bank officials would learn of his misappropriation the defendant engaged in conduct that included the following:

The defendant encouraged victim customers to conduct all their banking business with him because of his prior relationships with them. The defendant also told one victim customer that his account was access restricted and that he was the only bank officer authorized to assist them.

The defendant encouraged victim customers to have their account statements mailed to him by convincing them that mail service in their home country was not secure. That their account statements could be easily stolen and that as a result they could be subject to kidnapping, extortion or other acts of violence.

The defendant discouraged victim customers from electronically monitoring their account activity by telling them that online banking was not secure.

The defendant encouraged the victim customers to provide the bank with the defendant's name and cell phone number as the

person to contact in case issues arose with their accounts. The defendant did not advise the victim customers that his true purpose in making these statements, representations and recommendations was to enable him to misappropriate funds from the customers' accounts without the knowledge or consent of the customers and without the customers or bank officials learning of the defendant's misappropriations.

The defendant misappropriated substantial amounts of customers' funds for his own benefit. Over the course of the scheme the defendant misappropriated in excess of $11,000,000 in customer funds to invest in various business ventures in Guatemala, Spain and elsewhere.

These business ventures did not yield any profits. They all either failed entirely or lost most of their value.  The defendant further misappropriated in excess of $1,000,000 in customer funds to support various lifestyle extravagances for himself and others.

These extravagances included driving high price luxury automobiles, obtaining expensive jewelry for himself and others, maintaining an apartment on Miami Beach for approximately ten years, routinely treating friends, associates and coworkers to meals and flowers and routinely spending substantial amounts at bars and night clubs.

In order to impede detection of the scheme and to lull the victim customers into a false sense of security the defendant

misappropriated substantial amounts of funds from certain accounts in order to meet periodic interest payments owed to other customers or to meet requests from other customers to withdraw funds from their accounts.

Through this Ponzi type method that the defendant employed through the course of the scheme the defendant misappropriated in excess of $11,000,000 for these purposes. When the victims requested receipts or other account records the defendant created fraudulent records to conceal the theft and lull the victims into a false sense of security.

In order to impede detection of the scheme the defendant attempted to conceal his misappropriation of customer funds by directing those funds into shell and nominee accounts that the defendant controlled rather than into accounts that were readily traceable to him.

On or about March 11th, 2008, the defendant was in Guatemala on vacation and phoned the manager of the Lincoln Road branch of Bank of America. The defendant advised the manager he had a client named EB. The defendant claimed that EB needed an immediate wire transfer of $1.2 million from his certificate of deposit account from Bank of America to a business account at Bank of America in the name of Controladora de Negocios.

The same day the manager completed the transaction from EB's account at Bank of America based on the defendant's verbal

request. In actuality the Controladora de Negocios account was an account owned by VG, who was a separate victim customer. The defendant caused the move from EB's account to VG's account in order to cover the defendants theft of funds from VG.

Victim EB was not aware of the $1.2 million transfer from the certificate of deposit account and did not authorize it. Notwithstanding the defendant's efforts over the course of the scheme to prevent victim customers from monitoring activity, victim customer EB obtained a copy of his March 2008 account statement.

On April 21st, 2008, EB contacted a Bank of America security official to lodge a complaint regarding a discrepancy on the March 2008 account statement.

EB advised that the statement reflected withdrawals of two certificates of deposit, each which was worth $600,000. Although records indicated that funds had been deposited into the Controladora de Negocios account from where they were promptly wired at the request of victim customer VG to an account in Mexico city, EB advised he had no interest in the Controladora de Negocios account.

EB added that he suspected that the defendant had been responsible for the movement of his money. Following his meeting with the security officer EB was instructed to meet with the managers of the Lincoln Road branch of Bank of America. Later on April 21st, 2008, EB went to the Lincoln

Road branch. While there the defendant met EB. The defendant advised EB that he had needed the money for personal reasons that were, quote, a matter of life and death. Defendant told EB that the money would be replaced immediately, and proceeded to make a phone call.

Following the call the defendant told EB that he had opened for EB a 36-month certificate of deposit worth slightly in excess of $1.8 million with an interest rate of 5.56 percent, which was approximately twice the going rate.

The defendant then created a false document in an ultimately unsuccessful attempt to fund the new certificate of deposit. The document purported to originate from a Bank of America customer named MD who purported to represent himself as a real estate partner of EB.

In the document MD purported to authorize the bank to reimburse EB from his account. When a bank official was unable to authenticate the request he instructed the defendant to instruct MD to go to the U.S. Embassy in Jamaica. Defendant did not contact MD but instead falsely reported to the bank official that MD refused and claimed to be insulted by the request. That concludes our proffer, Your Honor.

00:20 THE COURT: Thank you, Mr. Davis.

00:21 Q. Mr. Figueredo, did you hear and understand what the Government says that you have done in this case?

00:21 A. Yes.

00:21 Q. Did you in fact do what the Government says you have done?
00:21 A. Yes.
00:21 Q. How do you plead to the charges set forth in the information guilty or not guilty?
00:21 A. Guilty.

THE COURT: It is the finding of the Court in this case that Ricardo Figueredo is fully competent and capable of entering an informed and voluntary guilty plea, that he is aware of the nature of the charges and the consequences of the guilty plea.

I find the guilty plea is a knowing and voluntary guilty plea supported by an independent basis in fact containing each of the essential elements necessary to prove the crime charged in the information.

I am going to tentatively schedule sentencing for April fourteenth, 2009 at ten a.m. I will ask counsel to let me know if there is a conflict. I note there will be some sentencing issues. I have no idea how much time will be required. When we get a couple weeks away, maybe a week away from the hearing let me know how long you think it will take.

There's also the issue of revoking Mr. Figueredo's bond. Part of the conditions of the plea agreement is that he will surrender today. I will enter an order revoking his bond and remand him at this time. Thank you. We will see you at sentencing.

- - -

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of proceedings in the above-entitled matter.

/S/PATRICIA SANDERS

____________ ________________________

DATE FILED PATRICIA SANDERS, RPR